Presby Construction v. Clavet, et al. CV-00-457-M    11/19/01

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Presby Construction, Inc.,
        Plaintiff

        v.                                    Civil No. 00-457-M
                                              Opinion No. 2001 DNH 210
Normand Clavet; Tom Caouette;
Geo-Flow, Inc., a/k/a Geo-Flow
Leaching System, Inc.,
        Defendants


O R D E R


In this copyright infringement action, plaintiff seeks injunctive relief, damages, and attorney's fees based upon defendants' alleged copying of a septic system design and installation handbook.  Before the court is defendants' motion for summary judgment (document no. 21).  Plaintiff objects.  For reasons given below, defendants' motion for summary judgment is granted.


**Standard of Review**

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P.

56(c).  "To determine whether these criteria have been met, a court must pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trialworthy issue as to any material fact."  Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001) (citing Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 14 (1st Cir. 2000)).  In defending against a motion for summary judgment, "[t]he non-movant may not rely on allegations in its pleadings, but must set forth specific facts indicating a genuine issue for trial."  Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001) (citing Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 174 (1st Cir. 1994)).  When ruling upon a party's motion for summary judgment, the court must "scrutinize the summary judgment record 'in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'"  Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)).


## Factual Background

The following facts are undisputed.  Defendant Geo-Flow Leaching System, Inc. ("Geo-Flow"), manufactures and distributes a patented leaching system.  For a time in the early 1990s, plaintiff was the sole distributor of Geo-Flow systems in New Hampshire.  (Presby Aff. ¶ 1; Compl., Ex. 1.)  While acting in that capacity, plaintiff's sole owner and president, David Presby ("Presby"), prepared a publication titled "Geo-Flow Leaching System™ Design & Installation Handbook for the State of New Hampshire" ("the 1992 handbook").  That handbook was first published on April 10, 1992, and was most recently revised on December 2, 1994.  (Compl., Ex. 1.)

Geo-Flow terminated its relationship with plaintiff in September 1995, on grounds that plaintiff had breached its distributorship contract by marketing its own competing product.  (Clavet Aff. ¶¶ 10, 11.)  In addition to terminating the distributorship agreement, defendants Tom Caouette and Geo-Flow (collectively "Geo-Flow") sued Presby and Presby Environmental, Inc. (collectively "Presby") in this court.  (Clavet Aff. ¶ 12.)  Geo-Flow filed suit in 1996.  Although Geo-Flow did not prevail

on all of its legal theories, the jury returned a verdict in its favor and against Presby in the amount of $450,000.

On February 7, 1996, approximately five months after Geo-Flow terminated its relationship with Presby, Presby applied for a copyright on the 1992 handbook (Compl. Ex. 2). A copyright was duly granted, effective as of April 11, 1996. (Id.) In 2000, Geo-Flow published its own handbook ("the 2000 handbook") titled "A Leaching System for the Twenty-First Century, Design & Installation Handbook with specifications for New Hampshire." (Compl. Ex. 4.) In this suit, plaintiff asserts that the 2000 handbook infringes its 1992 handbook copyright.

## Discussion

Defendants move for summary judgment on grounds that: (1) the two handbooks at issue are not substantially similar, which forecloses a finding that the 2000 handbook was produced by unlawful copying of plaintiff's 1992 handbook; and (2) the 1992 handbook is not subject to copyright protection because it is not an original work of authorship. Defendant further argues that plaintiff is barred, by the doctrine of judicial estoppel, from

4

claiming that the 1992 handbook is an original work of authorship because Presby maintained a contrary position during the 1996 suit brought against him by Geo-Flow. Plaintiff counters that summary judgment is precluded because of: (1) genuine issues of material fact concerning the originality of the 1992 handbook, in light of the inapplicability of the doctrine of judicial estoppel; and (2) defendants' failure to provide factual analysis to support their claim that the two handbooks are not substantially similar.

Because the two handbooks are not substantially similar, that is, not similar to the degree necessary to support a claim of copyright infringement, defendants' motion for summary judgment is granted. Given that resolution, the issues of originality and judicial estoppel are not reached.

According to the Copyright Act, "the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies . . ." 17 U.S.C. § 106. Furthermore, "[a]nyone who violates any of the exclusive rights of the copyright owner as

5

provided by sections 106 through 118 . . . is an infringer of the copyright . . . of the author." 17 U.S.C. § 501(a).

"To prevail on a claim of copyright infringement, the plaintiff must show both ownership of a valid copyright and illicit copying." <u>Yankee Candle Co. v. Bridgewater Candle Co.</u>, 259 F.3d 25, 33 (1st Cir. 2001) (citing <u>Feist Pubs., Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991)). Here, the court assumes, without deciding, that plaintiff owns a valid copyright in the 1992 handbook. Thus, the dispositive issue becomes one of "illicit copying."

In determining whether illicit copying has occurred, the court conducts a two-part test. <u>Yankee Candle</u>, 259 F.3d at 33.

> First, a plaintiff must prove that the defendant copied the plaintiff's copyrighted work, either directly or through indirect evidence. <u>Segrets, Inc. v. Gillman Knitwear Co.</u>, 207 F.3d 56, 60 (1st Cir. 2000). Second, "the plaintiff must prove that the copying of the copyrighted material was so extensive that it rendered the infringing and copyrighted works 'substantially similar.'" <u>Id.</u>; <u>see also</u> <u>Skinder-Strauss Assocs. v. Mass. Continuing Legal Educ., Inc.</u>, 914 F.Supp. 665, 672 (D. Mass. 1995) ("Even evidence of actual copying may be insufficient, however, if this copying was not substantial.").

Id. (footnote omitted).  As with the question of validity, the court assumes, without deciding, that defendant copied from the 1992 handbook when preparing the 2000 handbook, which leaves the question of substantial similarity.

> Whether there is substantial similarity between copyrightable expressions is determined by the "ordinary observer" test.  Concrete Mach. Co. v. Classic Lawn Ornaments [Inc.], 843 F.2d 600, 607 (1st Cir. 1988).  "The test is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protected [sic] expression by taking material of substance and value."  Id. (quoting Educ. Testing Servs. v. Katzman, 793 F.2d 533, 541 (3d Cir. 1986)) . . . .  Any comparison between . . . two works must be informed by a key theoretical foundation of copyright law: that "[i]deas cannot be copyrighted," id. at 606 (citing Harper & Row, Pubs., Inc. v. Nation Enters., 471 U.S. 539, 547 (1985)), and therefore that "[a]n artist 'can claim to own only an original manner of expressing ideas,' not the ideas themselves," id. (quoting Cooling Sys. & Flexibles [Inc.] v. Stuart Radiator [Inc.], 777 F.2d 485, 491 (9th Cir. 1985)).  Because of this dichotomy between "idea" and "expression," only the "protected expression" is relevant to an evaluation of substantial similarity.  Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1214 (11th Cir. 2000).

Id. at 33-34 (parallel citations omitted).

In Yankee Candle, the contested subject matter consisted of two sets of labels for candle fragrances published by rival

7

candle makers. Id. at 32. Both sets were superficially similar, in that the labels in each set were rectangular, had gold borders, and displayed "full-bleed" photographs of the source of the fragrances, i.e., various fruits, flowers, or foods. Id. To determine whether the competing labels were substantially similar, the district court conducted a "dissection" analysis – endorsed by the court of appeals – in which it first pared away the unprotected elements of the designs, including the "rectangular, gold-bordered name plate, [the] full-bleed photos, and [the use of] similarly sized labels," id. at 34, and then compared the remaining copyrightable elements, id. at 35. In making its comparisons, the court relied upon the merger doctrine, under which a "plaintiff has the heavy burden of showing 'near identity' between the works at issue," id. at 36 (citations omitted), when those works express ideas that may only be expressed in a limited number of ways," id. at 35-36. The handbooks at issue here are amenable to that same analytical approach.

According to plaintiff, defendants have "copied [both] the essential organization and expression contained in the Presby

8

[1992] Handbook," (Pl.'s Mem. of Law in Supp. of Obj. to Mot. Summ. J. at 14), as well as "specific details and expression," (id.) from the 1992 handbook. Plaintiff's claim that defendants have infringed its copyright on the essential organization of the 1992 handbook will be considered first, and then plaintiff's more specific claims of infringement.

I.   Essential Organization

With respect to the essential organization of the 1992 handbook, plaintiff argues that:

> Defendants have copied and utilized the basic form conceived by Mr. Presby and utilized in the Presby Handbooks, a form that is unique and distinct, and which organizes and expresses the information in an easily comprehensible manner. This form consists in part of the presentation of technical information in two columned, numbered, text, followed by numerous drawings. The defendants have adopted and utilized this same format in their handbook, and have reproduced many of the same drawings, with inconsequential alterations.

(Id. at 14-15.)

As a preliminary matter, it is doubtful that the graphic format described by plaintiff is protectable by copyright. In Yankee Candle, the court of appeals reasoned that:

> the use of a border element [on a label] is an essentially functional design choice not protected by copyright. See 17 U.S.C. § 101 (providing copyright protection for "works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects"); CMM Cable Rep, Inc. v. Ocean Coast Props., Inc., 97 F.3d 1504, 1519-20 (1st Cir. 1996) (copyright law denies protection to forms of expression directed solely at functional considerations). A border is a common method of separating a photograph from a background; the use of gold as the border color is a common method of signifying opulence and quality. See Pubs. Int'l, Ltd. v. Landoll, Inc., 164 F.3d 337, 341 (7th Cir. 1998). Likewise, copyright does not provide protection for the particular style of photography chosen by Yankee (full-bleed). To do so would impermissibly narrow the possibilities available to other label designers. See Designer's View, Inc. v. Publix Super Markets, Inc., 764 F.Supp. 1473, 1479 (S.D. Fla. 1991) (medium of artwork not protected by copyright).

259 F.3d at 35. Plaintiff's own characterization of the graphic format it seeks to protect (i.e., "a form that is unique and distinct, and which organizes and expresses the information in an easily comprehensible manner" (emphasis added)), brings this case squarely within the ambit of Yankee Candle. Plaintiff cannot claim an exclusive right to express technical information in a

10

format consisting of numbered paragraphs of text, laid out in two columns, followed by pictures. To allow plaintiff to protect a graphic format described so generically "would impermissibly narrow the possibilities available to other [handbook] designers," id. (citation omitted), by depriving them of the right to use common functional features.

Furthermore, even if the graphic format of the 1992 handbook were copyrightable, the 2000 handbook does not employ the same graphic format of the 1992 handbook. The cover of the 1992 handbook features a drawing, while the cover of the 2000 handbook features a photograph. The 1992 handbook consists of eighteen numbered pages, while the 2000 handbook consists of thirteen pages without numbers. The 1992 handbook has a table of contents, while the 2000 handbook has none. The 1992 handbook has eight pages of two-column text, while the 2000 handbook has only two. The 1992 handbook has a section titled "Terms and Definitions," while the 2000 handbook has none. The 2000 handbook has a full page section, with single-column type and a photograph, titled "GEO-flow's Components," while the 1992 handbook contains no such section. The 2000 handbook has an

11

entire page of single-column type devoted to "GEO-flow's Advantages," while the 1992 handbook presents roughly analogous information in a single paragraph of dual-column type titled "Advantages of the Geo-Flow System." The principal text of the 1992 handbook (encompassing eight pages) is presented in nine numbered sections, with titles, each containing paragraphs that are also numbered (1.1, 1.2, 1.3, and so on). The principal text of the 2000 handbook (encompassing two pages) is presented in thirteen numbered paragraphs, without titles or additional numbering. Finally, the 1992 handbook concludes with a page titled "Distribution Boxes Don't Work . . . (unless you use EQUALIZERs)," while the 2000 handbook has no such page. Given the numerous readily apparent differences between the graphic formats of the two handbooks, the court finds, as a matter of law, that the two graphic formats are not substantially similar under the "ordinary observer" test. See Yankee Candle, 259 F.3d at 33 (citing Concrete Mach., 843 F.3d at 607). And, because the two handbooks are not substantially similar in that respect, the graphic format of the 2000 handbook does not infringe plaintiff's copyright on the 1992 handbook.

12

II.  Specific Details

Having found that the graphic format of the 2000 handbook is not substantially similar to that used in the 1992 handbook, the court turns to the specific infringing details in the 2000 handbook that plaintiff identifies.  Those details fall into three main categories: charts, drawings, and text.  But before discussing those categories of expression, it is useful to focus briefly on the merger doctrine, and the allied "scenes a faire" doctrine, which provide the legal principles governing plaintiff's claims.

> In Concrete Machinery, we [the First Circuit] explained the rationale behind the merger doctrine:
>
>> Some ideas admit of only a limited number of expressions.  When there is essentially only one way to express an idea, the idea and its expression are inseparable and copyright is no bar to copying that expression.  [Even] [w]hen the idea and its expression are not completely inseparable, there may still be only a limited number of ways of expressing the idea.
>
> 843 F.2d at 606 (internal citations omitted).  In such cases, the plaintiff has the heavy burden of showing "near identity" between the works at issue.  Id. at 606-07 (citing Sid & Marty Krofft Television [Prods., Inc.] v. McDonald's Corp., 562 F.2d 1157, 1167 (9th Cir. 1977), and Flag Fables Inc. v. Jean Ann's Country Flags & Crafts, Inc., 730 F.Supp. 1165, 1171 (D. Mass. 1990)).  This heightened showing "is necessary because, as idea and expression merge, fewer and fewer aspects

13

of a work embody a unique and creative expression of the idea; a copyright holder must then prove substantial similarity to those few aspects of the work that are expression not <u>required</u> by the idea." <u>Id.</u> at 607 (citing <u>Universal Athletic Sales Co. v. Salkeld</u>, 511 F.2d 904, 908 (3d Cir. 1975)).

<u>Yankee Candle</u>, 259 F.3d at 35-36. As for the reason behind the doctrine:

When the uncopyrightable subject matter is very narrow, so that "the topic necessarily requires[]" if not only one form of expression, at best only a limited number, to permit copyrighting would mean that a party or parties, by copyrighting a mere handful of forms, could exhaust all possibilities of future use of the substance. In such circumstances it does not seem accurate to say that any particular form of expression comes from the subject matter. However, it is necessary to say that the subject matter would be appropriated by permitting the copyrighting of its expression. We cannot recognize copyright as a game of chess in which the public can be checkmated.

<u>Morrissey v. Proctor & Gamble Co</u>, 379 F.2d 675, 678-79 (1st Cir. 1967) (citations omitted) (affirming summary judgment for defendant who published a set of contest rules that were very similar to rules published by plaintiff, holding that "plaintiff cannot complain even if his particular expression was deliberately adopted").

14

While the court of appeals in <u>Yankee Candle</u> went on to explain that "the merger doctrine is most applicable where the idea and the expression are of items found in nature, or are found commonly in everyday life," <u>id.</u> at 36, that doctrine is also applicable to verbal expressions. For example, "where the rules of a promotional contest of the sweepstakes type were so straight-forward and simple, copyright protection did not extend to those rules." <u>CMM Cable Rep, Inc.</u>, 97 F.3d at 1522 (citing <u>Morrissey</u>, 379 F.2d at 678 (questioned in 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT (1995) (hereinafter "NIMMER") § 13.03[B], at 13-81); <u>American Dental Assoc. v. Delta Dental Plans Assoc.</u>, No. 92 C 5909, 1996 WL 224494, at *12 (N.D. Ill. 1996) ("[W]hile there are no hard and fast rules about when merger occurs, the consensus is that the 'shorter a phrase is, the less likely it is to have accep[table] substitutes, thus barring protection under the [m]erger [d]octrine.'") (quoting 1 PAUL GOLDSTEIN, COPYRIGHT § 2.7.3, at 2:100 (2d ed. 1996)).

Closely allied with the merger doctrine is the "scenes a faire" doctrine. Both doctrines are concerned "with preventing a monopoly on commonplace ideas, [but] they differ: merger applies

15

when the idea and expression are inseparable while scenes a faire applies when the similarity of expression results from stock scenes or elements that necessarily flow from a common idea," CMM Cable Rep, 97 F.3d at 1522 n.25 (citing 3 NIMMER § 13.03[B][3], at 13-76; § 13.03[B][4], at 13-82). In CMM Cable Rep, the court

> conclude[d] that CMM cannot succeed on its infringement claim with respect to the text of the supporting materials [newspaper ads, faxes, television advertisements, and on-air scripts] . . . [because] under the "scenes a faire" doctrine . . . the complained-of similarities consist of unoriginal elements flowing from the undisputed standard and inherent characteristics of direct mail radio promotions and, as such, "flow from the logic and necessities of [these radio] game[s]." Barris/Fraser [Enters. v. Goodson-Todman Enters.] 5 USPQ.2d [1887,] 1891 [1988 WL 3013 (S.D.N.Y. 1988)] (stating that to prevail in infringement claim of television show copied material must be more than stock element).

97 F.3d at 1522.

With the doctrines of merger and scenes a faire in mind, the court now focuses on the specific details of the 2000 handbook that plaintiff claims to be infringing. At the outset, it should be noted that as manuals for the design and installation of septic systems, which communicate various inflexible product specifications and legal requirements, the two handbooks at issue

16

here have much in common with the promotional materials at issue in both <u>CMM Cable Rep</u>, 97 F.3d at 1522 ("[defendant] WPOR's supporting materials do not constitute actionable copying to the extent that the similarities . . . involve standard "how to" features of direct mail radio promotion"), and <u>Morrissey</u> 379 F.2d at 678-79.  Like the courts that decided those cases, this court must take care not to allow the use of copyright to appropriate ideas.  <u>See</u> <u>id.</u> at 679.  Plaintiff identifies three categories of expression allegedly infringed by defendants: charts, drawings, and text.

**Charts.**  Plaintiff asserts that two charts in the 2000 handbook infringe its copyright on two charts in the 1992 handbook.  Specifically, he claims that: (1) defendants' chart titled "Spacing of GEO-flow pipes / Feet Center-to-Center between pipes" infringes its copyright on a chart in the 1992 handbook titled "GEO-FLOW PIPE SPACING CHART / Minimum Center to Center Spacing"; and (2) defendant's chart titled "Slope Design Chart / Drop Between Lines of GEO-*flow* for Particular Pipe Spacings and Slopes" infringes its copyright on a chart in the 1992 handbook titled "Slope Design Chart / Percentage of Slope."  Both charts

17

are standard box charts, displaying values for one variable across the top (the x-axis) and values for another variable down the left-hand side (the y-axis), and both charts (predictably) convey identical data.  At the same time, however, the charts in the 2000 handbook are oriented differently on the pages on which they appear, have somewhat different headings, and contain certain slightly different design elements.  In other words, the charts in the 2000 handbook are not mere photocopies of the charts in the 1992 handbook.  Because the charts consist predominantly of uncopyrightable material, i.e., the data they contain and the standard manner of presentation they employ, and because there are, in fact, discernable differences between the two sets of charts with respect to the minute amount of copyrightable expression in them, the charts in the 2000 handbook do not infringe plaintiff's copyright on the 1992 charts.  To rule otherwise would essentially bar defendant from using a common graphic representation of the information in those two charts, a result repugnant to the Copyright Act.  See Morrissey, 379 F.2d at 678-79.

18

**Drawings.**  Plaintiff asserts that seven drawings in the 2000 handbook infringe its copyright on a like number of drawings in the 1992 handbook.  One of the disputed drawings ("Typical Parts for GEO-*flow* Leaching System" in the 2000 handbook, "PARTS OF GEO-FLOW SEPTIC LEACHING SYSTEM" in the 1992 handbook) depicts the parts used in constructing a Geo-Flow leaching system, while the remainder of the drawings are plan views and cross-section elevations related to various types of Geo-Flow systems constructed in a variety of topographic settings.  Because both sets of drawings depict the same product used to build septic systems conforming to the same physical principles and legal standards, both sets of drawings predictably contain much the same information.  In other words, because the similarities between the two sets of drawings "flow[] from the logic and necessities," CMM Cable Rep, 97 F.3d at 1522, of building a functional septic system using Geo-Flow products, consistently with applicable law, the scenes a faire doctrine plainly applies and renders non-actionable plaintiff's copying of defendant's depictions of those many aspects of designing and installing a Geo-Flow system that cannot be depicted effectively in any other way.

19

As for the remaining aspects of the drawings, those that do not flow from the logic and necessities of designing a Geo-Flow septic system, it is apparent that the drawings in the 2000 brochure were not simply traced, photocopied, or otherwise mechanically reproduced from the 1992 handbook. See Yankee Candle, 259 F.3d at 36 ("If Bridgewater had scanned Yankee's labels into a computer and reproduced them exactly, it would have certainly infringed Yankee's copyrights on those labels.") The drawings in the two handbooks are ordered and organized differently (ten drawings on seven pages in the 1992 handbook as opposed to ten drawings on eight pages in the 2000 handbook), and the drawings in each handbook have their own distinguishing artistic touches. For example, the principal pipes in the 2000 handbook are cross-hatched (as they were in a one-page flier produced by defendants prior to the production of the 1992 handbook (see Presby Aff., Ex. 1)) while in the 1992 handbook, the pipes are not cross-hatched. Given the constraints imposed by the subject matter depicted, the purposes for which the two handbooks were prepared, the degree of copying allowed by the scenes a faire doctrine, and the identifiable differences between the two sets of drawings identified above, plaintiff has not

20

carried "the heavy burden of showing 'near identity' between the works at issue." Yankee Candle, 259 F.3d at 36 (quoting Concrete Mach., 843 F.2d at 607-07).

**Text.** Plaintiff fares no better on its claims of infringing text. Each of plaintiff's three assertions of allegedly infringing text will be examined in turn. See Yankee Candle, 259 F.3d at 37 n.7 (approving "an extensive comparison of [the] corresponding labels . . .").

Plaintiff claims that Point 1 and the note to Point 6 in the 2000 handbook are substantially similar to ¶ 1.18 in the 1992 handbook.

¶ 1.18 in the 1992 handbook provides:

"Use a clean, medium to coarse sand, with a particle size of .175 mm to 2 mm, in systems where the Geo-Flow slope design is less than 15%. Systems with a Geo-Flow slope design greater than 15% must use a clean, loamy, fine sand with a particle size of .05 to 1.25 mm to slow the percolation rate and to control the downward flow of effluent to the low point of the system (*Fig. 2*)."

Point 1 and the note to Point 6 in the 2000 handbook provide:

"GEO-*flow* pipe is a leaching system **approved** for use in New Hampshire as per these design specifications. See <u>Figure 1</u> for a schematic of the GEO-*flow* system. All installations of GEO-*flow* pipe require a minimum of 6 inches of sand around the circumference of the pipe. Unless otherwise specified, plans should specify the use of clean, medium to coarse sand with a particle size of .175 mm to 2 mm.

. . .

**Note:** A clean, loamy, sand with a particle size of .05 mm to 1.25 mm with a slower percolation rate must be used on sloping sand bed designs greater than 15% in order to control effluent flow to the downhill side."

The only discernable similarity between the two passages is that each recommends using sand with the same particle size for leaching beds with the same slopes, for the same purposes. As for the manner in which the idea is expressed, defendants split the idea between two paragraphs, while plaintiff expresses it in one. Defendants use an entirely different type-face than plaintiff for the name of the product, and defendants include two additional ideas in the accused paragraphs that are absent from plaintiff's paragraph, namely requirements (ideas) related to state approval and the amount of sand necessary around the circumference of the pipe. While both handbooks use the phrase "clean, medium to coarse sand, with a particle size of .175 mm to 2 mm," defendants' use of that phrase is not actionable because

22

"[i]t is axiomatic that copyright law denies protection to 'fragmentary words and phrases' and to 'forms of expression dictated [sic] solely at functional considerations' on the grounds that these materials do not exhibit the minimum level of creativity necessary to warrant copyright protection." CMM Cable Rep, 97 F.3d at 1519 (citations omitted).

Plaintiff also claims that Point 4 in the 2000 handbook is substantially similar to ¶¶ 1.3 and 1.5 in the 1992 handbook.

¶¶ 1.3 and 1.5 in the 1992 handbook provide:

"Systems may be designed in irregular shapes to accommodate unusual terrain. Beds, for instance, can be trapezoidal, curved or L-shaped rather than rectangular. Longer single lines are preferable to multiple shorter lengths, because the longer lines provide better settling of suspended solids that may have passed through the septic tank, allowing them to be collected inside the Geo-Flow pipe.

. . .

Ideally, the minimum individual line length of Geo-Flow pipe should be 30 feet, with a maximum of 100 feet. In some cases it may be necessary to design in shorter or longer lengths to work around obstacles or problems."

Point 4 in the 2000 handbook provides:

23

> "***The ideal minimum individual length*** of GEO-*flow* piping should be 30 feet.  Length should not exceed 100 feet.
>
> **NOTE:** Longer lines provide better settling of suspended solids which may have escaped from the septic tank."

As with the previous comparison, the allegedly infringing text is substantially different, as a verbal expression, from the text plaintiff claims defendant copied.  The strongest similarity between the two texts is that they express the same idea: that Geo-Flow pipes should be at least 30 feet long, should not be longer than 100 feet, and work better at greater lengths because longer length allows for better settling of suspended solids. But these common ideas are presented differently; plaintiff's handbook uses many more words, splits the idea between two different paragraphs, and explores an area left entirely unaddressed by defendant, namely alternative bed shapes that may be created using the product.  And, as with the previous comparison, the single phrase appearing in both texts, "longer lines provide better settling of suspended solids," is simply too cryptic, idea-laden, and lacking in creativity to support a claim of copyright infringement.  See id.

Finally, plaintiff claims that Point 6 in the 2000 handbook is substantially similar to ¶ 1.18 in the 1992 handbook. However, based upon an examination of the 1992 handbook, and the fact that plaintiff claims its copyright on ¶ 1.18 was infringed by other sections of the 2000 handbook, it appears that plaintiff meant to claim that Point 6 in the 2000 handbook is substantially similar to ¶ 2.1 in the 1992 handbook rather than ¶ 1.18.

¶ 2.1 in the 1992 handbook provides:

> "**Raised Bed Design and Raised Sloping Bed Designs:** Clean, medium to coarse sand, with a particle size of .175 mm to 2 mm, should extend a minimum of 1.0 feet beyond the Geo-Flow pipe on all sides for raised beds and raised sloping bed designs, and 3.0 to 4.0 feet on the lower side of a raised sloping bed design. Fill on all sides of a raised bed design must extend a minimum of 5.0 feet beyond the Geo-Flow pipe before sloping a maximum of 3 to 1 (2:1 with a waiver). Fill on the lower side of a raised sloping bed design must extend a minimum of 6.0 feet beyond the Geo-Flow pipe before sloping a maximum 3 to 1 (2:1 with a waiver) (*Figs. 2, 4, 5 and 7*).

> **Note:** Sloping bed designs greater than 15% must use a clean, loamy, find sand, with a particle size of .05 mm to 1.25 mm, with a slower percolation rate to control effluent flow to the downhill side (*Figs. 2, 4, 5, and 7*)."

Point 6 in the 2000 handbook provides:

25

"In New Hampshire, for **raised sand beds and raised sloping sand bed designs**, clean medium-to-coarse sand with a particle size of .175 mm to 2 mm, should extend a minimum of 12 inches beyond the GEO-*flow* pipe on all sides, and **3.0 to 4.0** feet on the lower side of a raised sloping sand bed design. See <u>Figure 2</u> for a flat raised bed design and <u>Figure 3</u> for a sloped raised bed design.

The following charts can be used to determine the proper spacing ("A" in Figures 2 and 3) and drop ("B" in Figure 3) between lines. First, use the "Spacing of GEO-*flow* pipes" chart to determine the proper spacing "A" between Geo-*flow* lines based on the percent slope and the soil percolation. Next, for a sloped design, use the "Slope Design Chart" to determine the proper drop between GEO-*flow* lines based on the distance between the lines "A" and the percent slope.

Fill on all sides of a **raised sand bed design** must extend a minimum of **5.0** feet beyond the GEO-flow pipe before sloping a maximum of **3:1 (2:1) with a variance)**.

Fill on the lower side of a **raised sloping sand bed design** must extend a minimum of **6.0** feet beyond the GEO-flow pipe before sloping to a maximum of **3:1 (2:1 with a variance)**.

**Note:** A clean, loamy sand with a particle size of .05 mm to 1.25 mm with a slower percolation rate must be used on sloping sand bed designs greater than 15% in order to control effluent flow to the downhill side."

While the correspondence between the two passages quoted above is greater than the correspondence in the other two comparisons identified by plaintiff, it is still permissible. On the one hand, the passages differ to the extent that the 2000 handbook uses more paragraphs to separate the basic ideas being expressed and, in addition, provides more specific reference to the figures

that follow the text.  But more importantly, these passages contain very little protectable expression because the ideas expressed are so strongly functional.  See id.

In summary, the undisputed factual record, viewed in the light most favorable to plaintiff, contains no evidence of impermissible copying.  Plainly (and predictably), there are similarities between the two handbooks, but those similarities result from the fact that both handbooks are intended as functionally based expressions of the same basic ideas about designing and installing septic systems using Geo-Flow products that also comply with legal requirements.  Because the two publications are so strongly functional, they contain little protectable creative expression.  Consequently, defendants enjoy considerable latitude with respect to copying.  If plaintiff's interpretation of copyright law prevailed, defendants, and all others, would be effectively prevented from producing a useful handbook for the design and installation of Geo-Flow leaching systems that meet legal requirements.  Because copyright law protects expression rather than ideas, see Yankee Candle, 259 F.3d at 33, and disfavors the appropriation of subject matter,

see <u>Morrissey</u>, 379 F.2d at 679, defendants are entitled to judgment as a matter of law.  The 2000 handbook contains no impermissible copying, and does not infringe plaintiff's copyright on the 1992 handbook.

## Conclusion

For the reasons given, defendants' motion for summary judgment (document no. 21) is granted.  The Clerk of Court shall enter judgment in accordance with this order and close the case.


**SO ORDERED.**


                                   _____
Steven J. McAuliffe
United States District Judge

November 19, 2001

cc:  Douglas L. Ingersoll, Esq.
     Daniel L. Mitchell, Esq.