Annalee v. Townsend                 CV-03-327-JD  12/09/03  P

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


Annalee Mobilitee Dolls, Inc.,
Charles E. Thorndike

    v.                                    Civil No. 03-327-JD
                                       Opinion No. 2003 DNH 215P
Townsend Design Studios, Inc.,
Townsend D. Thorndike


**REPORT AND RECOMMENDATION**


The Plaintiffs have moved for a preliminary injunction seeking to enjoin the Defendants from alleged copyright and trade dress infringement, and from alleged false advertising, pertaining to a soft sculpture Santa Doll that defendants intend to produce and sell (document no. 3). Defendants have filed an objection.

After considering the evidence presented during the hearing, and the relevant authorities, I recommend that the court deny Plaintiffs' request for a preliminary injunction on their copyright and trade dress infringement claims, and grant the Plaintiffs' request for a preliminary injunction on their false advertising claim, except with regard to Defendants' use of the

photographs discussed herein.[1]

Background

A.   The Parties

Annalee Mobilitee Dolls, Inc. ("AMD") is a New Hampshire corporation with a principal place of business in Meredith, New Hampshire.  AMD was incorporated in 1962 to design, produce and distribute collectible handcrafted and soft sculptured dolls.  Barbara Annalee Davis ("Annalee"), at one time Annalee Thorndike, had previously made such dolls, initially as a hobby, and distributed several hundred through craft outlets.  At one time AMD employed more than 330 people in the Meredith production and sales facility, but it now has all of its products made in China.

Plaintiff Charles E. Thorndike and defendant Townsend D. Thorndike ("Townsend") are sons of AMD founders Annalee and Chip Thorndike.  Charles Thorndike is the older of the two brothers, and is Chairman of the Board of Directors of AMD.

Townsend was President of AMD until 1995 when he was

---

[1]At the evidentiary hearing, Defendants stipulated to the entry of a preliminary injunction against them with regard to the use of a Sun emblem and the "Annalee Mobilitee Dolls" federally registered trademark, and requiring the Defendants to include a disclaimer on its commercial advertising.  I recommend that those stipulations, discussed in more detail at the conclusion of this report, be made orders of the court.

replaced by Charles Thorndike.  Townsend continues to own approximately one-third of all AMD common stock, but only 12 percent of the voting stock.  Townsend is a former director of AMD, and participated in the design process of some of AMD's products.

Townsend Design Studios, Inc. ("Studios") is owned and run by Townsend.  It is a New Hampshire corporation with a principal place of business in Meredith, New Hampshire.  Studios was incorporated in May 2002 to design, produce and distribute collectible soft sculpture dolls and artifacts.  Studios operates its doll-making business near the location where AMD formerly made dolls while they were still made in Meredith.  As of the date of the injunction hearing, Studios had made seventy-five Santa dolls.

Annalee, cofounder and inspiration for the AMD enterprise, died in 2002.  The bitter discord that exists within the Thorndike family is at the heart of this case.  Simply stated, the issues in dispute are:

> 1.   Should the Defendants be enjoined from offering for sale three versions of Santa dolls because they infringe upon AMD's copyrights or trade dress?;[2] and

_____

[2]A fourth doll, "Mrs. Santa," was not included in the complaint, and is therefore not at issue in this suit.

3

2. Should Defendants be enjoined from implying in its advertising that AMD or Annalee endorsed or participated in the creation of Defendants' products, and from displaying photographs of Annalee in any marketing capacity?

B. Facts

AMD and Studios are in the same business, the manufacture and sale of collectible soft sculptured objects, including poseable Santa Claus dolls. The headquarters of these two corporations are located within one hundred and fifty yards of each other.

AMD's dolls are marketed with a stitched-in label identifying the dolls as an AMD doll and identifying that the doll was made in China. Studios manufactures, among other things, a "Holly Santa" doll. Studios' Santa doll also bears a stitched-in label identifying the dolls as Studio's dolls. In addition, the Studios' doll is packaged with a tag that identifies the manufacturer as "Townsend Design Studios." In response to complaints from AMD, that tag contains the following disclaimer: "Townsend Design Studios, Inc. designs and products are not associated with Annalee Mobilitee Dolls, Inc." Studios manufactures and sells three versions of Santa dolls that AMD

4

alleges violates its copyrights and trade dress.[3]

1.   AMD's Copyrighted Santas

AMD copyrighted a number of its Santa dolls and Santa faces over a period of years.  AMD has identified seven copyrights with respect to which plaintiffs seek preliminary injunctive relief. See Pl. Ex. 2-8.

AMD's 18" Mr. Santa (copyright Registration No. VA-116-215, renewal registration RE-726-217) appears to be approximately 18" tall.  See Pl. Ex. 2.  The doll is wearing a red coat trimmed in white fur, red pants, green mittens, and black boots.  Id.  The coat and hat are trimmed in white fur.  Id.  The doll has a white beard, and white mustache.  Id.  The face of the 18" Mr. Santa has a ruddy complexion with rosy cheeks, a bulbous nose with horizontal lines on the bridge, wide-open blue eyes, a face etched with lines and wrinkles, raised eyebrows, and a mouth open in an "oh" shape.  Id.  The 18" Mr. Santa appears to have a wire frame with a rounded base at the bottom.  Id.

AMD's 18" Santa with 18" Reindeer (copyright Registration No. VA-124-440) is similar in appearance to AMD's 18" Mr. Santa,

_____

[3]The Plaintiffs do not have any patents that cover the soft sculpture dolls at issue in this case, nor do they claim that Defendants have misappropriated any trade secrets.

but has both arms clasped around the neck of a standing reindeer. See Pl. Ex. 3. The Santa's eyes appear to be closed, but the mouth is open and the eyebrows are raised. Id.

AMD's 18" Santa Hugging Reindeer (copyright Registration No. VA-841-335) appears different from the 18" Santa w/18" Reindeer in that the Santa is depicted looking at the camera over the back of the reindeer with its head nestled against the back of the reindeer's neck. See Pl. Ex. 4. The Santa's eyes and mouth are wide open and the eyes appear to be looking slightly to its right. Id. 18" Santa Hugging Reindeer, like the other AMD "outdoor" Santas, is wearing a red suit (although no white fur trim is visible) and a red hat trimmed in white fur. Id.

AMD's 18" Musical Santa (copyright Registration No. VA-880-950) appears to be wearing a red suit trimmed in white fur, although the shape of the fur trim differs from that on the 18" Mr. Santa. See Pl. Ex. 5. The 18" Musical Santa has wide-open blue eyes looking to the left and with raised eyebrows. The Musical Santa is holding an open "book" of Christmas carols in both hands, which appear to have green mittens. Id.

AMD's 18" Gift List Santa (copyright Registration No. VA-878-666) is wearing a red suit trimmed in white fur, similar to

that on the 18" Musical Santa.  See Pl. Ex. 6.  The 18" Gift List Santa has black mittens and black boots and is holding a "list" in its right hand and a pencil in its left.  Id.  The face of this Santa features wide-open blue eyes looking to the right, a bulbous nose, white mustache, one raised and one invisible eyebrow, and a pair of glasses perched low on its nose.  Id.  The 18" Gift List Santa also has a green plaid scarf draped across its shoulders and hanging down to just above its right boot.  Id.

AMD's 30" Deck the Halls Santa (copyright Registration No. VA-880-242) differs from all of the previously described AMD copyrighted Santas in that Deck the Halls Santa has a black belt around its middle and instead of a red coat and pants, wears an ankle-length red coat trimmed in white fur at the bottom.  See Pl. Ex. 7.  In addition, the Santa appears to have a short cape, also trimmed in white fur, over its shoulders.  Id.  The Santa has a solid plastic or wood base and a red hat with a long sleeve and a white fur pompom on the end.  Id.  30" Deck the Halls Santa leans a little to his right, as if beginning to walk in that direction, and in its right hand appears to hold a green sack containing white-glazed pine cones, a candy cane, and red ribbons.  Id.  The eyebrows are raised and the eyes are wide

7

open, but the colored part of the eye is proportionately smaller and does not appear to be blue. Id. The head is slightly tilted toward the right and the eyes are focused off to the right as well. Id. The mouth is wide open in the "oh" shape and it appears that the tongue is visible. Id.

AMD's Mr. Santa Head (copyright Registration No. VA-1-011-440) depicts expressions on six different Mr. Santa doll faces. See Pl. Ex. 8. These drawings appear in black and white with only the eyebrows, eyes, nose, mustache and mouth of the Mr. Santa face apparently claimed. Id. The expression on the face on the top left of the page has wide-open eyes, an open mouth and visible tongue. Id. The expression on the face in the top center of the page has wide-open eyes that look to the right and a slightly open mouth. Id. The expression on the face in the top right of the page has wide-open eyes that look to the left and a slightly open mouth. Id. The expression on the face in the bottom left has wide-open eyes, a wide-open mouth, and a visible tongue. The expression on the face appears to depict laughter. The expression on the face in the bottom center has wide-open eyes, a wide-open mouth with the bottom lower lip open slightly more on the right side, and with a visible tongue. The

8

expression of the face in the bottom right corner has wide-open eyes, an open mouth, but no visible tongue.

2. AMD's Trade Dress

Plaintiffs' definition of AMD's claimed trade dress appears at various places in the record, and are not entirely consistent. The definition that appears in Plaintiffs' most recent memorandum of law, and which the Court finds to be supported by the evidence presented during the hearing, is as follows:

> a pear-shaped, felt face; with screen-printed features made to resemble hand-made brushstrokes; line art on the face that features spike eyebrows, a serrated moustache flowing to upturned points that do not connect with the beard, white highlights on the cheeks, lips, eyes, and nose; a w-shaped beard; heightened rosiness on the cheeks with an airbrushed [look], intense in the center and fading toward the edges; poseability; a posed look upon sale; and furrier stitching.

Plaintiffs' Reply Memorandum In Support Of Their Motion For A Preliminary Injunction at 4. This definition has been narrowed from claims made in Plaintiffs' earlier filings.[4] The AMD trade

---

[4]The definition of AMD's claimed dress cited above should be compared with paragraph 44 of Plaintiffs' Request for Findings of Fact and Conclusions of Law, which claims, among other things, a "red outfit, consisting of a jacket and pants, and trimmed with white fur; red hat trimmed with white fur, with a white ball on the end; green or black mittens sewn with a furrier stitch; and black boots sewn with a furrier stitch." See also, Ver. Compl., ¶ 16 (claiming green or black mittens and black boots).

dress was purported to be exemplified in a doll that was marked as an exhibit at AMD's Rule 30(b)(6) deposition, and which was introduced into evidence during the hearing as Plaintiffs' Exhibit 17 (see 18" Musical Santa discussed above).

3.   Studios' Santa

Studios' Santa design includes a 9" tall stuffed Santa figure covered in felt over a thin metal rod from shoulder to toe inside the doll that extends out from the foot of the doll. Studio's Santa has a circular base, with the doll positioned in an upright position, and the doll may be posed in different positions.

Studios' Santa is clad in a red coat and hat, each trimmed with white faux fur, and has a black belt, black boots, and black mittens.  Studios' Santa is "standing" beside a (proportionally) large green felt sack, which is cinched near the top.  Protruding from the top of the sack is a miniature toy bear, French horn, and foil-wrapped box.  Studios' Santa is "holding" the toy sack with its right hand.

Studio's Santa is made of felt and has a painted face.  The painted face of Studios' Santa includes, rosy cheeks, a long slender nose with a bright red "cherry" appearance at the end of

10

the nose, white eyebrows and a white beard. The Santa's eyes are dark colored, narrow, and look to the left and slightly upward. The painted mustache is white with black highlights. The mouth is flat and nearly closed.

### 4. Comparison of AMD and Studios Santas

During the injunction hearing, the witnesses compared two different versions of the AMD Mr. Santa, Pl. Ex. 17 and 20, and a Studios' Santa, Pl. Ex. 15.

#### a. **Similarities Between the Parties' Dolls**

AMD's and Studios' dolls both use National Nonwovens' "flesh" colored felt, intended to resemble the appearance of Caucasian flesh, for the doll faces. See Pl. Ex. 81.[5] AMD's and Studios' dolls both have pear-shaped or teardrop-shaped faces. The heads of AMD's and Studios' dolls are spherical and made from two pieces of felt. The dolls have slightly projected foreheads, cheeks and chins. The dolls contain string stuffing for the heads to make the forehead, cheek, and chin projections.

AMD's and Studios' dolls both contain a wire skeleton, which enables the dolls to be moved into different poses. The bodies

---

[5]This color was developed by request for AMD. Plaintiffs' refer to this color felt as "Annalee Flesh" Felt.

of the dolls are stuffed with similar materials.

The stitching of the Studios' dolls on the heads, mittens, and boots use a "furrier" stitch, which is also employed by AMD. The evidence showed that this particular stitch gives the dolls a hand-crafted look.

Each doll has a holly sprig on the upper right of the dolls face, although some of the materials used for the sprig differ. Each doll has a beard of wispy, white hair, that has been attached in a "W" shape.

Both parties' dolls have screen-printed faces with airbrushed cheeks. Each face has spike white eyebrows. Both parties' dolls have white highlights near the outside of the eyes and a white highlight inside the dolls' pupils. The nose of each doll is outlined with brown paint and has a red tip with white highlights. Each doll has ruddy cheeks, with red color airbrushed, rather than hand-painted. The airbrushed cheeks have intense color toward the center of each cheek and face toward the edges.

The moustache of each doll is white and has upturned points that do not connect with the dolls' beard. In addition, the underside of each dolls' moustache has sharp edges resembling a

serrated edge.  Both dolls have red lips with white highlights.

### b.    **Dissimilarities Between the Parties' Dolls**

A visual inspection of AMD's Santa, Pl. Ex. 17, and Studios' Santa, Pl. Ex. 15, shows that several features of parties' dolls are different.  The AMD Santa is at least twice the size of the Studios' Santa.  The face of the AMD Santa is etched with lines and the nose is bulbous rather than slender and, unlike the Studios' Santa, lacks the bright red "cherry" appearance at the end of the nose.  The head of the AMD Santa appears more rounded and the eyes are open wide and are blue.  The mouth of the AMD Santa is wide open in an "oh" shape as if singing.  Studios' Santa is not depicted as singing and its mouth appears nearly closed.  The AMD Santa does not have a bag of toys and its mittens are green instead of black.

### 5.    Defendants' Advertising

Plaintiffs introduced evidence that Defendants have displayed an image of Annalee on the Studios' website in close proximity to the statement: "Symbolizing the return and continuation of a great family heritage in soft sculpture, Townsend Design Studios proudly presents the new generation of design evolution for many years to come."  Pl. Ex. 53.

13

Defendants have made the same statement in other advertisements. See Pl. Ex. 41, 55, and 56.

Studios' website has displayed a picture of Studios' Santa to the left of the following statement: "Over many years Annalee Mobilitee Dolls gained an international reputation for quality and sensitivity to the buying public.  Townsend Design Studios is honoring a long standing tradition." Pl. Ex. 53.  Defendants made the same or similar statements in other advertisements.  Pl. Ex. 56, 57, and 60.

The evidence shows that Studios' website contained a statement that: "It is fitting that the Santa should be the first release to symbolize the return and continuation of a great family heritage in soft sculpture."  Pl. Ex. 53.   Defendants make the same statements in another advertisement.  Pl. Ex. 56.

On their invitation to a June 22, 2003 open house, Defendants stated the event was "commemorating over 50 years of the design and manufacture of handcrafted soft sculpture art form in Meredith[,] New Hampshire."  Pl. Ex. 77.  After the open house, Defendants similarly stated in a July 15, 2003 advertisement that the June 22, 2003 event "celebrated more than 50 years of design and manufacturing of soft sculpture and art in

14

Meredith." Pl. Ex. 59.

Defendants' invitation to its June 2003 event depicts a small sign that states: "Through this door pass the most skilled and creative dollmakers and craftsmen in the U.S.A.," and describes Studios' facilities as the "Factory at the Farm." Pl. Ex. 77. Plaintiffs' assert that the "through this door" statement is a verbatim reproduction of a well-known inscription found on AMD's factory, and that it has long used the moniker "Factory in the Woods" to describe its Meredith facility.

The evidence further shows that Defendants have published a photograph in Studios' advertising in which Annalee and Townsend are presented an award as "1991 New England Entrepreneur of the year." See Df. Ex. A. Defendants have also published as part of Studios' advertising a 1954 photograph of Annalee with Townsend as a child, apparently holding dolls. See Df. Ex. D.

Discussion

A.  Preliminary Injunction Standard

"The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." CMM Cable Rep., Inc. v.

15

Ocean Coast Prop., Inc., 48 F.3d 618, 620 (1st Cir. 1995) (citing Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal., 840 F.2d 701, 704 (9th Cir. 1988); Am. Hosp. Ass'n v. Harris, 625 F.2d 1328, 1330 (7th Cir. 1980)).  Thus, if the court ultimately finds for the movant, a preliminary injunction provides the court with a method for preventing or minimizing any current or future wrongs caused by the defendant.  CMM Cable Rep., 48 F.3d at 620.

A district court may grant a movant's request for a preliminary injunction if the movant satisfies a four-part test, often stated as follows: (1) a likelihood of success on the merits; (2) a risk of irreparable harm to the movant if the injunction is not granted; (3) a favorable balance of the equities; and (4) the injunction would not adversely affect the public interest.  See Langlois v. Abington Hous. Auth., 207 F.3d 43, 47 (1st Cir. 2000).  In the First Circuit, the "sine qua non" of the preliminary injunction analysis is whether the movant can demonstrate a likelihood of success on the merits.  Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993).  To warrant preliminary injunctive relief, the movant's showing on the likelihood of success must be substantial.  See I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998) (stating the

16

preliminary injunction test as requiring a showing that the moving party is "substantially likely to succeed on the merits of its claim"); TEC Eng'g Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 544 (1st Cir. 1996) (same). When considering claims based on copyright, trademark or trade dress infringement, irreparable harm may be presumed even in the absence of demonstration of actual injury, if a likelihood of success on the merits has been sufficiently demonstrated. See e.g, I.P. Lund Trading, 163 F.3d at 33. The Court applies this standard in reviewing AMD's request for injunctive relief.

B.    Copyright Claims

To establish copyright infringement, a plaintiff must demonstrate (1) ownership of a valid copyright and (2) illicit copying. See Yankee Candle Co. v. Bridgewater Candle Co., LLC, 259 F.3d 25, 33 (1st Cir. 2001). Defendants do not dispute that the copyrights that AMD has put in issue are valid for purposes of consideration of the instant motion.

To prove that illicit copying has occurred, the plaintiff must first demonstrate, by direct or indirect evidence, that the defendant copied the plaintiff's copyrighted work. Id. at 33. If there is no evidence of actual copying, copying may be

17

inferred if the plaintiff can show that the defendant had access to the copyrighted work and that the works are substantially similar.  Id.

Once a plaintiff has proven that the defendant has copied the plaintiff's work, the plaintiff has the burden of proving "that the alleged infringing work is 'substantially similar' to the protected expression" in the copyrighted work.  Id. at 33 n.4, quoting Matthews v. Freedman, 157 F.3d 25, 27 (1st Cir. 1998).

Plaintiffs have sufficiently demonstrated that the Defendants have copied AMD's Santa dolls.  The evidence demonstrated that Townsend instructed one his employees, Shirley Ballou, to obtain "Annalee Flesh" felt.  In order to obtain access to the felt, a Studio's employee cut a portion of the felt on an AMD doll and submitted it to National Nonwovens.  Studios then began using the same National Nonwovens' felt to make its Santa dolls.

The evidence further demonstrated that Townsend instructed Ms. Ballou to obtain the same type of fabric labels that AMD used on its dolls.  Ms. Ballou testified Townsend instructed her that these labels should be the same size that AMD used.

18

Bernadette Haines testified that she observed Townsend taking digital pictures of AMD doll faces, and observed him transferring those images to his computer. Ms. Haines testified that she was instructed by Townsend to similarly take digital pictures of AMD doll faces and then transfer them to Townsend's computer. Ms. Haines testified that she observed Townsend edit the AMD doll faces on his computer. Ms. Haines testified that the doll faces in Plaintiffs' Exhibit 82 appear to be the images that she saw on Townsend's computer.

There was also evidence that Townsend had significant access to AMD's dolls and doll faces, that he participated in the design of some AMD dolls and that he has retained control over a structure that houses original AMD screen art. This evidence provides indirect support for Plaintiffs' allegation of copying.

Moreover, there are numerous similarities between Studios' and AMD's Santa dolls. Testifying as an expert, Len Cirelli, a principal of the manufacturer of AMD's dolls, stated that his comparison of Studio's Santa doll with AMD's Santa doll revealed that Studios replicated every process, material, and method used by AMD in the manufacturing of its Santa doll. While some of Cirelli's testimony focused on elements that are arguably

19

functional, including the string stuffing used in the head and the use of the furrier stitch, he extensively discussed the similarity in the method of applying the paint to the doll face to give a hand-painted look, and the style of the line art used on the doll faces.

Although the Plaintiffs' evidence of copying is substantial, after doing a copyright-by-copyright comparison of each of AMD's copyrights at issue with the Studios' Santa, the Court does not find that Studio's Santa is substantially similar to the protected expression in the copyrights. See Yankee Candle, 259 F.3d at 33-34 (finding that only the protected expression is relevant to an evaluation of substantial similarity).

Apart from the difference in size of Studios' Santa in comparison to the various AMD Santas in the copyrights at issue, the appearance of Studios' Santa may be distinguished from the appearance of each of the AMD copyrighted Santas in numerous ways. Studios' Santa has a markedly different outfit design than AMD's 18" Mr. Santa, Pl. Ex. 2, and Studios' Santa also differs because it is holding a toy sack. Studios' Santa differs from AMD's 18" Santa with 18" Reindeer, Pl. Ex. 3, and 18" Santa Hugging Reindeer, Pl. Ex. 4, in that Studios' Santa is not

20

depicted with a reindeer. Studios' Santa differs from AMD's 18" Musical Santa, Pl. Ex. 5, in that it is not holding a book of carols, and differs from AMD's 18" Gift List Santa, Pl. Ex. 6, in that it is not depicted wearing glasses, or holding a list and pencil. Studios' Santa differs from AMD's 30" Deck the Halls Santa, Pl. Ex. 7, in that Studios' Santa does not wear an ankle-length red coat, a short cape, or stand on a solid plastic or wood base. And the expression of the face of Studios' Santa does not appear to be a copy of any of the Mr. Santa doll faces depicted on AMD's 7" Mr. Santa Head, Pl. Ex. 8.

Plaintiffs allege for the first time in their supplemental memorandum, filed after the conclusion of the injunction hearing, that Plaintiffs Exhibits 20 and 35 are entitled to independent protection as "derivative works," and that Studios' Santa infringes these derivative works. The Court finds that plaintiffs have not demonstrated a likelihood of success on the merits with respect to this claim for three of reasons.

First, the Plaintiffs did not allege that Studios infringed any derivative works in their complaint. Therefore, this claim is not properly before the court. Second, the Plaintiffs did not present any evidence at the injunction hearing to establish that

21

the Mr. Santa dolls that are now claimed to be derivatives, are in fact derivatives of the copyrights at issue. And third, the Plaintiffs' alleged derivative works have not been registered. As the Plaintiffs' acknowledge, there is split of authority regarding whether the owner of an unregistered derivative work may sue a copier of the derivative work. The First Circuit has not decided this issue. The Court is unpersuaded by the Plaintiffs' argument that the First Circuit's ruling Gamma Audio & Video, Inc. v. Ean-Chea, 11 F.3d 1106 (1st Cir. 1993), supports their position. That case is distinguishable in that the plaintiff in Gamma Audio claimed that the defendant infringed its exclusive right to distribute registered and copyrighted images contained within an unregistered derivative work. The First Circuit did not suggest in Gamma Audio that the plaintiff would be entitled to relief for protection of an unregistered derivative work standing alone.

The Court finds that the Plaintiffs have not shown a substantial likelihood of success on the merits of AMD's copyright infringement claims. Accordingly, the Court recommends that Plaintiffs' request for a preliminary injunction with regard to the copyright claims be denied.

C.   Trade Dress Claims

Section 43(a) of the Lanham Act gives a producer a cause of action for the use by any person of "any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods . . . ."  15 U.S.C. § 1125(a). This section has been held to apply to a manufacturer's "trade dress," "a category that originally included only the packaging, or 'dressing,' of a product, but in recent years has been expanded by many courts of appeals to encompass the design of a product."  Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 209 (2000).  "Trade dress includes 'the design and appearance of [a] product together with the elements making up the overall image that serves to identify the product presented to the consumer."  I.P. Lund Trading, 163 F.3d at 35, quoting, Chrysler Corp. v. Silva, 118 F.3d 56, 58 (1st Cir. 1997) (additional citations omitted).

To establish a trade dress infringement claim, a plaintiff must demonstrate that (1) the trade dress has been used in commerce, (2) the trade dress is nonfunctional, (3) the trade dress is inherently distinctive or has acquired distinctiveness

23

through secondary meaning, and (4) that prospective purchasers of the products in question are likely to be confused as to the source of the products. See Yankee Candle, 259 F.3d at 38; I.P. Lund Trading, 163 F.3d at 36, 43. There is no dispute that the Plaintiffs' dolls have been used in commerce. Therefore, I do not discuss the first requirement for protection against infringement further.

1. Functionality

A party seeking to exclude new entrants based on a claim of trade dress infringement of a product design has the burden of showing the non-functionality of the design feature. Wal-Mart, 529 U.S. at 214; I.P. Lund Trading, 163 F.3d at 36-37. A "functional" product feature is one that "is essential to the use or purpose of the article or [that] . . . affects the cost or quality of the article." I.P. Lund Trading, 163 F.3d at 37, quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 850 n. 10 (1982) (brackets in original); see also, I.P. Lund Trading, 163 F.3d at 37 n.5 ("A design is, inter alia, nonfunctional if it is not 'essential to the use or purpose of the article' and does not 'affect[] the cost or quality of the article.") (citations omitted). However, "a particular arbitrary combination of

24

functional features, the combination of which is not itself functional, properly enjoys protection." Id. at 37, quoting Taco Cabana Int'l v. Two Pesos, Inc., 932 F.2d 1113, 1119 (5th Cir. 1991), aff'd, 505 U.S. 763 (1992). The court need determine the effect of granting protection on the opportunity of other to compete. I.P. Lund Trading, 163 F.3d at 37.

Defendants argue that a number of elements that AMD claims as part of its trade dress are functional, and therefore not entitled to protection under the Lanham Act. To begin with, certain elements contained within the AMD and Studios' Santas, such as a red suit trimmed with white fur, are common to numerous depictions of Santa Claus in the marketplace, and the Court does not consider those elements as part of the Plaintiffs' claimed trade dress. See Kurt S. Adler, Inc. v. World Bazaars, 897 F. Supp. 92, 95 (S.D.N.Y. 1995) (finding that the stereotypical elements of Santa Claus such as a "jolly, rotund, elder gentleman, wearing a red suit and floppy cap with white trim, and a black belt and boots," may not be protected).

Defendants have argued that the internal wire frame and head and body stuffing used on AMD's and Studios' Santa dolls are functional elements that are necessary to the design of a

25

poseable, soft sculpture doll, for which Plaintiffs admit they have no design patent. Defendants also produced a witness at the hearing, Pat Rogers, who testified that the use of a "furrier" stitch made the dolls cheaper to produce by hand than other methods and could be employed easily and cost effectively by Studios. Therefore, Defendants argue, the use of the "furrier stitch" on the Studios' Santa is an element that "affects the cost" of the article and is therefore functional. I.P. Lund Trading, 163 F.3d at 37. In the Court's view, Defendants have raised close questions regarding AMD's attempt to prevent a competitor from manufacturing a Santa doll with an internal wire frame, string stuffing, and a furrier stitching. For the purposes of Plaintiffs' motion for a preliminary injunction, the Court does not consider those elements as part of AMD's protectable trade dress because the Plaintiffs have not demonstrated a substantial likelihood of success on the element of non-functionality.

Even without the excluded elements discussed above, there are numerous other elements that AMD claimed constitute its trade dress that appear to the Court to be non-functional. Plaintiffs have argued, and introduced expert testimony to support, that the

following elements are non-functional: a pear-shaped, felt face; with screen-printed features made to resemble hand-made brush strokes; line art on the face that features spike eyebrows, a serrated moustache flowing to upturned points that do not connect with the beard, white highlights on the cheeks, lips, eyes, and nose; a beard attached in a "W" shape; heightened rosiness on the cheeks with an airbrushed look, intense in the center and fading toward the edges; and a posed look upon sale.[6] See Kurt S. Adler, 897 F. Supp. at 95 (listing the protectable expression of Santa Claus at issue as including a "pear shaped head, a red underlip emphasized, an upcurving mustache, a skin tone bubble nose, [and] rounded boots"). Plaintiffs introduced evidence that competitors routinely market collectible Santa dolls without the features in AMD's claimed trade dress. See Pl. Ex. 23-24. The evidence further demonstrates that the AMD's combination of features are not found in other dolls sold in the industry or in other depictions of Santa Claus. Pl. Ex. 23-24; Df. Ex. B. The Court finds the Plaintiffs' evidence sufficient to demonstrate

---

[6]This district court has previously described AMD's style of doll as having the distinguishing characteristics of "pear shaped faces, furrier stitched chins, heightened rosiness of cheeks, stitched in Annalee label and simple plastic wrapping." Annalee Mobilitee Dolls, Inc. v. Caldor Corp., Civ. No. 95-175-M, 1995 U.S. Dist. LEXIS 8512 at *6 (D.N.H. Apr. 14, 1995).

that the remaining elements of AMD's claimed trade dress are non-functional.

2.   Secondary Meaning

In order for a plaintiff to succeed on the merits of a product-design trade dress infringement claim, the plaintiff must prove that AMD's trade dress has acquired secondary meaning. Wal-Mart, 529 U.S. at 212.  This is so because product design may not be considered inherently distinctive.  Id.

"As to secondary meaning said to stem from the design of the product itself, . . . the plaintiff must show that the primary significance of the design is to signify its source."  I.P. Lund Trading, 163 F.3d at 33.  "Proof of secondary meaning entails vigorous evidentiary requirements."  Boston Beer Co. Ltd. P'ship v. Slesar Bros. Brewing Co., 9 F.3d 175, 181 (1st Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 125 (4th Cir. 1990)).  A plaintiff faces an even higher threshold of proof in a product design/configuration case.  Yankee Candle, 259 F.3d at 43 n. 12.  In the instant case, a lack of sufficient evidence of secondary meaning is the Plaintiffs' Achilles' heel for purposes of their request for preliminary injunctive relief.

The First Circuit has found that "[t]he only direct evidence

28

probative of secondary meaning is consumer surveys and testimony by individual consumers." Yankee Candle, 259 F.3d at 43. Plaintiffs did not introduce any survey evidence during the hearing, nor did they introduce any testimony from individual consumers. The testimony given by AMD's officers and employees, and by Len Cirelli, that they have observed consumers who immediately recognize an AMD Santa doll as coming from AMD is not probative evidence. See id., at 43 n. 14 (finding that the opinions of retailers and distributors active in the field and extremely familiar with the plaintiff's products is hardly evidence of whether the "consuming public" forms the same association).

Absent probative direct evidence, AMD could still demonstrate that its Santa dolls have acquired secondary meaning through the introduction of circumstantial evidence. Id. at 43. The types of circumstantial evidence that a court may consider in determining whether a plaintiff has established that a trade dress has acquired secondary meaning include: "the nature and extent of advertising and promotion of the trade dress, and the efforts made to promote a conscious connection by the public between the trade dress and the product's source." Id. at 43,

29

citing, <u>Boston Beer</u>, 9 F.3d at 182. The court may also consider the product's "established place in the market" and proof of intentional copying. <u>Yankee Candle</u>, 259 F.3d at 44, <u>citing</u>, <u>I.P. Lund Trading</u>, 163 F.3d at 42.

Plaintiffs have introduced evidence that AMD has advertised its Santa dolls in catalogues since at least the early 1970s. <u>See</u> Pl. Ex. 27-40. Similarly, Plaintiffs introduced evidence that AMD expends significant resources on advertising attributable to AMD Santa dolls, Pl. Ex. 26, and that sales of AMD's Santa dolls have been successful, Pl. Ex. 25. However, this evidence does not sufficiently demonstrate, by itself, that the public makes a conscious connection between the claimed trade dress and the source. <u>See</u> <u>Yankee Candle</u>, 259 F.3d at 44 ("To be probative of secondary meaning, the [plaintiff's] advertising must direct the consumer to those features claimed as trade dress.").

Plaintiffs argue that AMD's advertising is probative of secondary meaning because it has directed consumers to "look for" the unique faces on AMD dolls. Advertising that specifically directs a consumer's attention to those features claimed as trade dress may support a finding of secondary meaning. <u>Yankee Candle</u>,

259 F.3d 44.  A review of the evidence in the record shows that the most commonly emphasized features in AMD's advertising are "the famous whimsical expressions" of AMD dolls, see Pl. Ex. 27-30, 38, and that the dolls are handcrafted, see Pl. Ex. 28-30.[7] AMD's advertising does not emphasize the particular aspects that Plaintiffs claim constitutes AMD's trade dress, namely screen-printed features made to resemble hand-made brush strokes; line art on the face that features spike eyebrows, a serrated moustache flowing to upturned points that do not connect with the beard, white highlights on the cheeks, lips, eyes, and nose; and heightened rosiness on the cheeks with an airbrushed look, intense in the center and fading toward the edges.  "Merely 'featuring' the relevant aspect of the product in advertising is no more probative of secondary meaning than are strong sales." Yankee Candle, 259 F.3d at 44.  The Court finds that the evidence of AMD's advertising is not sufficiently probative of secondary meaning of AMD's claimed trade dress.[8]

_____

[7]While Plaintiffs' Exhibit 28 indicates that the AMD doll head is "flesh felt with soft white whiskers," that is the only reference to "flesh felt" that the Court has located in the advertising in the record.

[8]The Plaintiffs have requested a finding of fact that Defendant Townsend and Pat Rogers admitted that "the consuming public recognizes an [AMD] Santa doll when they see it, and that

Plaintiffs argue that a finding in their favor on secondary meaning is supported by the evidence of the Defendants' intentional copying.  While intentional copying has been identified as a factor that courts may consider on the element of secondary meaning, the defendant's intent "plays a particularly minor role in product design/configuration cases."  <u>Yankee Candle</u>, 259 F.3d at 45.  A copier may simply be attempting to exploit a particularly desirable feature as opposed to attempting to confuse customers as to the product's source.  <u>Id.</u>, <u>citing</u>, <u>Duraco Prods. Inc. v. Joy Plastic Enters., Ltd.</u>, 40 F.3d 1431, 1453 (3d Cir. 1994).  The Court finds that the evidence of copying that the Plaintiffs have offered, while substantial, cannot carry the day.  <u>See</u> <u>Yankee Candle</u>, 259 F.3d at 44 ("Proof of secondary meaning requires at least <u>some</u> evidence that consumers associate the trade dress with the source.") (emphasis in original).

---

the dolls' artwork makes it distinctive in the minds of consumers."  Pl. Req. for Findings of Fact and Conclusions of Law, ¶¶ 53-54.  The Court does not make such a finding.  The Plaintiffs did not examine Townsend and Pat Rogers on those issues during the evidentiary hearing, and even if they had, those statements would not prove the truth of the matter asserted.

While the Plaintiffs may be able to demonstrate at trial that AMD's dolls have acquired secondary meaning, the Court finds that the evidence presented during the injunction hearing does not demonstrate that the Plaintiffs have a substantial likelihood of proving secondary meaning, which is a necessary element of Plaintiffs' trade dress infringement claims. Because the Court finds that the Plaintiffs have not met their burden on the element of secondary meaning, the Court does not address the element of likelihood of confusion as to source.

D.    False Advertising Claims

1.    Elements of a False Advertising Claim

To establish a false advertising claim under the Lanham Act, a plaintiff must demonstrate that (1) the defendant made a false or misleading description of fact in a commercial advertisement about his own or another's product, (2) the misrepresentation is material, i.e., likely to influence the purchasing decision, (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured by the misrepresentation. See Cashmere & Camel Hair Mfrs. Inst. v. Saks

33

<u>Fifth Ave.</u>, 284 F.3d 302, 310-11 (1st Cir. 2002), <u>citing</u> <u>Clorox</u>

<u>Co. P.R. v. Proctor & Gamble Commercial Co.</u>, 228 F.3d 24, 33 n.6

(1st Cir. 2000).

    2.    <u>False or Misleading Description of Material Fact</u>

"A plaintiff can succeed on a false advertising claim by

proving either that the defendant's advertisement is literally

false or implicitly false--that is, the advertisement is true or

ambiguous yet misleading." <u>Cashmere</u>, 284 F.3d at 311.  If the

defendant's advertising is literally false, the plaintiff may

demonstrate a violation without evidence of consumer deception.

<u>Id.</u>  However, if the defendant's advertising is implicitly false,

the plaintiff has the burden to show that the advertising is

likely to cause confusion or to deceive customers to warrant

injunctive relief.  <u>Id.</u>  The evidence shows that the Defendants

have made the following statements in commercial advertising:

1.    Symbolizing the return and continuation of a great family
heritage in soft sculpture, Townsend Design Studios proudly
presents the new generation of design evolution for many
years to come.

2.    Over many years Annalee Mobilitee Dolls gained an
international reputation for quality and sensitivity to the
buying public.  Townsend Design Studios is honoring a long
standing tradition.

3.    It is fitting that the Santa should be the first release to
symbolize the return and continuation of a great family

34

heritage in soft sculpture.

4.  commemorating over 50 years of the design and manufacture of handcrafted soft sculpture art form in Meredith, New Hampshire.

5.  Through this door pass the most skilled and creative dollmakers and craftsmen in the U.S.A.

6.  Studios' facilities is the "Factory at the Farm."

Plaintiffs argue that Defendants' advertising is literally false in that Studios is not the same entity as AMD, nor is it a continuation of AMD. In the alternative, Plaintiffs argue that Defendants' advertising is implicitly false and likely to cause confusion in that it suggests an affiliation between Studios and AMD. Plaintiffs also argue that Defendants' advertising is likely to cause confusion in that it suggests that Annalee sponsors Studios' products. Plaintiffs argue that Defendants' representations are material because AMD's or Annalee's involvement in the design of a doll is likely to influence a consumer's buying decision.

In response, Defendants counter that Plaintiffs' false advertising claims must fail because Defendants' advertising is not false or misleading. Defendants assert that it is truthful to state that Townsend is Annalee's son, that Townsend has years of experience in the doll-making industry, and that Townsend

35

comes from a doll-making heritage. Defendants also assert that Studios employs doll-makers who formerly worked for AMD. Were Defendants advertisements limited to these basic assertions, the Court would be inclined agree. Defendants' statements are not so limited.

The Court finds that each of the statements alleged to be false or misleading by Plaintiffs, even if vague enough to not be deemed literally false, is likely to cause confusion among consumers. The Court makes the following findings:

Studios' use of the statement: "Symbolizing the return and continuation of a great family heritage in soft sculpture, Townsend Design Studios proudly presents the new generation of design evolution for many years to come," is misleading in that it implies that the Studios' business is a continuation of AMD, or that Studios is an entity related to AMD.

Studios' use of the statement: "Over many years Annalee Mobilitee Dolls gained an international reputation for quality and sensitivity to the buying public. Townsend Design Studios is honoring a long standing tradition" is misleading in that it clearly implies a present affiliation between AMD and the Studios' business, or that Studios is an entity related to AMD.

36

Studios' use of the statement: "It is fitting that the Santa should be the first release to symbolize the return and continuation of a great family heritage in soft sculpture" is misleading in that it implies that the Studios' business, not Townsend individually, was a part of, or affiliated with AMD.

Studios' use of the statement: "commemorating over 50 years of the design and manufacture of handcrafted soft sculpture art form in Meredith, New Hampshire" is misleading in that it clearly evokes the long-running business of AMD, and implies that Studios is affiliated with, or sponsored by AMD.

Studios' use of the phrase, "Through this door pass the most skilled and creative dollmakers and craftsmen in the U.S.A.," alleged to have been in use for years at the AMD facility, is misleading in that it implies that Studios is a continuation of AMD's business, or has an affiliation with AMD.

Studios' description of its facilities as the "Factory at the Farm" is misleading in that it is confusingly similar to AMD's "Factory in the Woods" moniker, and misleadingly implies an affiliation between AMD and Studios.

The Court further finds that the Defendants' statements are material. "The materiality component of a false advertising

37

claim requires a plaintiff to prove that the defendant's deception is 'likely to influence the purchasing decision.'" Cashmere, 284 F.3d at 311, quoting, Clorox, 228 F.3d at 33 n.6. The evidence demonstrates that AMD has been in business since at least 1962. AMD has expended substantial resources on advertising and developing goodwill in the industry. The Court finds that it is likely that Studios' advertisements influence the consumer's purchasing decision by exploiting AMD's good will.

2. The Misrepresentation Deceives
   or Has the Tendency to Deceive

Plaintiffs argue that there is overwhelming evidence of actual customer confusion. Christine Hodecker, Director of AMD's Wholesale Sales, testified that three different sets of retailers saw Defendants' advertisement and believed that it was an advertisement for an Annalee doll. Charles Thorndike testified that a Nevada retailer saw one of the Defendants' advertisements and assumed that Studios' was affiliated with AMD. Lisa Ekholm, manager of AMD's gift shop, testified that numerous individuals came into AMD's gift shop on June 22, 2003, the day of Studios' open house and barbeque, believing that the event was affiliated with AMD. Ms. Ekholm further testified that a customer came into AMD's gift shop and asked her for Studios' Santa doll after

38

seeing a newspaper advertisement. The Court is satisfied that Plaintiffs have demonstrated that Defendants' statements in its advertising have deceived consumers, or that it has a tendency to deceive, which is all that is required to warrant injunctive relief. Cashmere, 284 F.3d at 314 n.12.

3.    Use of Annalee's Image In Defendants' Advertising

Plaintiffs seek an order preventing the Defendants from including images of Annalee in Defendants' advertising. Plaintiffs argue that Defendants' advertising is false or misleading in that it suggests that Annalee endorses Studios' products.

Messages conveyed in visual images are to be considered in false advertising claims brought under the Lanham Act. See Gillette Co. v. Norelco Consumer Prods. Co., 946 F. Supp. 115, 128 (D. Mass. 1996) (citing cases). Disassociated from any allegedly false or misleading text, the Court does not find that the photographs that Defendants used are themselves literally or implicitly false.[9] The photographs do not depict Annalee holding a Studios' product or amongst Studios' products. Moreover, the Plaintiffs do not allege that the photographs at issue are not

---

[9]Studios has not claimed in any advertisement that its products were designed or endorsed by Annalee.

39

genuine, that the Defendants did not have a right to possess them, or that Plaintiffs have copyright protection for the photographs. The Court does not find, based on the evidence presented, that the Plaintiffs' have demonstrated that they are likely to succeed on their false advertising claim with regard to Defendants' use of the photographs at issue.

4. Other Preliminary Injunction Factors

Having found that the Plaintiffs have demonstrated a likelihood of success on the merits of their false advertising claim with respect to the six statements in Studios' advertising discussed herein, the Court presumes that AMD is likely to suffer irreparable harm in the absence of injunctive relief. The Court further finds that the public interest would be served by enjoining the Defendants from engaging in the allegedly misleading advertising, and that the balance of the equities favors the Plaintiffs. On the facts of this case, there should be no requirement for the Plaintiffs to post a bond.

Conclusion

For the reasons stated above, I recommend that the court grant the Plaintiffs' motion for a preliminary injunction (document no. 3) with respect to the following stipulated issues:

1.    Defendants and their officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them, or any of them, be enjoined and restrained from selling, offering for sale, displaying, making or otherwise using the Sun emblem previously found on Defendants' website, displayed on certain signs, and featured on t-shirts and totebags.

2.    Defendants and their officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them, or any of them be enjoined and restrained from using the "Annalee Mobilitee Dolls" federally registered trademark.

3.    Defendants are ordered to include the following disclaimer on all commercial advertising (including, without limitation, the Internet, mail advertising, newspaper and trade journal advertisement, and trade show presentations), and on all products sold: "Townsend Design Studios, Inc. designs and products are not associated with Annalee Mobilitee Dolls, Inc."[10]

I recommend that the court deny Plaintiffs' request for a preliminary injunction on their copyright and trade dress infringement claims, and grant the Plaintiffs' request for a preliminary injunction on their false advertising claim, except with regard to the Defendants' use of the photographs discussed herein. I recommend that the court issue an order that Defendants and their officers, agents, servants, employees, and

---

[10]Defendants seek the right, not agreed upon by the parties, to state in their disclaimer that Studios' products are "original" and "distinctive." Plaintiffs object. The Court recommends that the Defendants be ordered to comply with the disclaimer as stated herein.

41

attorneys, and all persons in active concert or participation with them, or any of them be enjoined and restrained from publishing the statements found to be misleading in this report in any commercial advertising (including, without limitation, the Internet, mail advertising, newspaper and trade journal advertisement, and trade show presentations).

Any objections to this Report and Recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

_____
James R. Muirhead
United States Magistrate Judge

Date:     December 9, 2003

cc:  James E. Higgins, Esq.
     Arnold Rosenblatt, Esq.
     Daniel J. Bourque, Esq.

42